Davis, J.,
delivered the opinion of the court:
The removal of the Choctaws, Cherokees, and Chickasaws from the territory which they occupied at the beginning of this century gave rise to numerous difficult and complicated questions : first, questions political in their nature, all now happily ended by the settlement of the different tribes in the Indian Territory, where they are successfully pursuing the path of modern civilization; second, questions financial in their nature, springing from the treaties by virtue of which the Indians emigrated from the Bast.
It became necessary for the protection of the Indians, no less than for the advantage of the whites, that the tribes should move west of the Mississippi. The Indian was not prepared to surrender his tribal organization, and, taking land in sev-eralty, to settle into the domestic life of the American citizen and into Caucasian methods of agriculture; on the other hand, the United States could not, even had they desired, restrain the advance of their own people.
The Choctaws and Cherokees have already been before us demanding an adjustment of long-pending controversies with the Government, and now the Chickasaws, coming by a very different channel and under a very different grant of jurisdiction, invoke our aid for the same purpose.
Cases of this kind are most intricate, and are, for a court of law, most difficult to decide satisfactorily. The questions of law founded on the treaties and statutes present obstacles surmounted with comparative ease, but the facts are most difficult to find upon evidence at once competent and convincing. Over fifty years ago these Chickasaw Indians were gathered from the broad plains of the Southern States; they came into the place of rendezvous in straggling detachments; steamboats were employed to transport them, upon which many of them refused to go; the mode of the tribe’s assembling caused delay and expense; conductors, agents, interpreters, and other guides or servants were necessarily furnished them; many of the tribe *243 went overland, absolutely refusing water transit, and were, in some instances, months making the journey; others went part of the way by land and part of the way by water; the exact number taking either route is impossible of exact ascertainment, as is the total population of the nation at the time, and the number of those who remained at home preferring to share the white man’s system of government to an emigration westward.
The Indians complain that the transfer was extravagantly managed by the Government agents; that the treaty agreement was not fulfilled; that waste at least, if not actual fraud upon their rights, was committed by the officers acting for the United States, the guardians, in aid of the Indians, the wards.
More than fifty years after the event, upon testimony enormous in quantity but unsatisfactory in quality, we are called upon to examine these numerous questions of fact, as well as others, in relation to the disbursement of trust funds held by the Government for certain specified classes in the Chickasaw Nation.
The case is important in that it involves the just dealing of a powerful and rich Government with a weak tribe whose valuable lands were taken for a consideration alleged not to have been fairly fulfilled; and in that it also involves a sum of money of the utmost importance to the claimants, and which, if allowed, will make serious inroad upon the Treasury of the defendants.
In furtherance of the policy of transfer to the Indian Territory, several treaties were made with the Chickasaws, then principally resident in Mississippi. The first of these treaties was concluded October 20,1832, to which certain explanatory articles were added two days later (7 Stat. L., 381, 388); May 24,1834, another treaty was concluded (id., 450, 456); finally, the 22d of June, 1852, a third treaty was signed (10 id., 974) from which directly grew the reference to this court.
By the treaty of 1832 the Chickasaws declared that rather than be subject to State laws they preferred to remove to the West, where they might be governed by their own laws, and tor that purpose had determined to sell their lands and to seek á new home. To accomplish this, and with the President’s approval, they agreed to cede to the United States their lands east of the Mississippi, the lands to be surveyed as public *244 lands by the Government and offered for sale, all tlie money received to be paid over to the Chickasaw Nation less “the whole cost and expenses of surveying and selling the land, including every expense attending the same.” The Nation agreed to hunt up a home west of the Mississippi, but in the event of failing in that prior to the first public sale of their eastern lands, they promised to select out of the surveys a comfortable settlement for every family upon a certain specified allotment basis. When the Chickasaws were ready to remove west they were to notify the President, who was then to furnish them with the funds necessary for their transportation and journey and for one year’s provisions after reaching their new home, the cost thereof to be ultimately refunded from the proceeds of the. ceded lands, the money from which was to be largely invested, by the President in interest-bearing or dividend-paying stocks.
The treaty of 1834 related largely to the protection of those Indians entitled to land who were orphans or who were deemed incompetent to manage their affairs. It provides a plan for their protection, it makes various provisions affecting reservations of land, and generally covers the same subject as the treaty of 1832, which to some extent it repeals. These treaties we shall hereafter refer to more in detail.
In February, 1837, the chiefs and headmen of the Chickasaws notified the President that they were ready to remove to the Indian Territory, and asked that he provide means for their transportation and subsistence. This was done, and the tribe removed by degrees from Mississippi to the country of their friends and allies, the Choctaws, who had already gone west. After a temporary sojourn there they took up the lands upon which they still live. The expenses incurred by United States officers in the removal were charged against the nation’s fund, and upon these charges is founded the first general complaint of the Chickasaws, the second being based upon the wrongful payment by the United States to persons not entitled to receive it of Chickasaw money held in trust under the treaty of 1834 for the incompetents and orphans.
Article 4 of the treaty of 1852 was designed to quiet these complaints, and, as amended in the Senate, it provided in substance as follows:
That an account should be prepared, under the direction of the Secretary of the Interior, exhibiting in detail all the moneys *245 which from time to time had been placed in the Treasury to the credit of the nation “ resulting from the treaties of 1832 and. 1834, and all the disbursements made therefrom,” this account to be submitted to the Chickasaws, who in a reasonable time could file exceptions to it, these exceptions to be referred to the Secretary of the Interior, who (and we now quote the words of the treaty) “shall adjudicate tbe same according to the principles of law and equity, and his decision shall be final and conclusive on all concerned.” As to the money of the orphans and incompetents alleged to have been “ wrongfully paid out to persons having no right to receive the same,” it was stipulated that the cases should be investigated by “ the agent of the United States under the direction of the Secretary of the Interior, and if it shall appear to the satisfaction of the said Secretary that any of the orphans and incompetents have been defrauded by such'wrongful payment, the amount thus misapplied shall be accounted for by the United States as if no such payment had been made.”
This article (IV) the Senate amended by adding certain provisos, one of which was that the United States should not be under obligation to reimburse expenditures already made in conformity with the treaties of 1832 and 1834; another was that the United States should not be liable to repay moneys held in trust for the orphans and incompetents, “in any case in which payment of such moneys had been made upon the recommendation or certificate of the persons appointed for that purpose in the fourth article of the treaty of 1834, or of their successors, and in other respects in conformity with the provisions of that article,” and a third proviso absolved the United States from any responsibility as to land disposed of in conformity with treaties of 1832 and 1834.
The account called for by the treaty was prepared; it was submitted to the Chickasaws in 1868; and in 1869 exceptions to it were filed in the Department of the Interior; some preliminary investigation was thereafter made, but no definite action was taken until the 8th day of May, 1883, when the Secretary transmitted the matters in controversy to this court for our “ consideration and action in accordance with the provisions of section 2 of the act of March 3, 1883,” known as the Bowman Act.
The Choctaw Case (21 C. Cls. R., 59) came to us by special act of Congress, as did the Cherokee Case (20 C. Cls. R., 449), *246 which was in effect an action between the eastern and western bands of the tribe, an action in which the United States were interested but as stakeholders. The Chickasaw Case reaches us by authority of a legislative grant of jurisdictional power very different in its nature from the remedy and jurisdiction specifically given in each of the former cases with the express assent of the Indian tribes who were parties to them.
• The rights of the Chickasaw Nation are founded upon a treaty, an instrument which is a contract between the parties, and also a law imposed by the Government upon its own citizens and agents. As a contract, the Chickasaws are entitled to all its benefits until it is varied by mutual consent or annulled in some manner recognized by law. The case now before us, as defined by the fourth article of the treaty of 1852, is divisible into two parts: First, the management and disbursement of the general funds. As to this branch the claimants are entitled to an account, to exceptions thereto, to a reference to the Secretary of the Interior, to an adjudication by him on principles of law and equity, and to a decision by him which shall be final and conclusive on all concerned. Second, as to the money of the orphans and incompetents. The claimants have a right to an investigation by the agent of the United States under the direction of the Secretary of the Interior, and to an account of the moneys misapplied, should it appear to the Secretary’s satisfaction that any wrongful payment has been made. On the first branch the Secretary is to finally adj udicate; on the second branch the Secretary is to be satisfied as to the wrongful payment.
In the treaty, therefore, is to be found no authority or permission from which any power can be inferred authorizing this court to act in any way in regard to the case at bar.
The only statute which could give us jurisdiction when this case was transmitted was the Bowman Act.
The Indians are not citizens of the United States; their rights are founded upon treaty, and as this statute gives them no privileges, it can impose upon them no burdens which they do not voluntarily accept. The authority given the Secretary by the treaty is in its nature judicial, and as such cannot be delegated. It is specific, under a clear and unambiguous agreement, by which the Indians referred the dispute to him and to no one else; they agreed to abide b,y his decision, and did *247 not agree to abide by the decision of this court. The power-of final decision the Secretary cannot delegate, and if that were all in the case we could proceed no further in it. But the treaty also authorizes, as a preliminary to the Secretary’s decision, an investigation or examination; that he not only has a right to depute, but the treaty in terms provides for such action on his part. Such an examination, while it was begun some years since-, has never passed beyond the preliminary stages, and is therefore a matter pending in the Department and capable of reference hither. (Jackson v. United States, 19 C. Cls. R., 508.)
We do not understand that the restriction of section 1066 of the Devised Statutes, excluding from our jurisdiction a claim' “ growing out of or dependent on any treaty stipulation entered into with foreign nations or with the Indians tribes” affects this case. That restriction is upon cases defined in sections 1059 .and 1063 of the Devised Statutes, cases in which final judgment is entered, and it cannot be held to apply to the jurisdiction since given by the act of 1883, a jurisdiction which in this ease, as to the Secretary of the Interior, is in effect advisory, and subject to the exceptional power, in terms given him by treaty, of final adjudication -of the issues raised between the United States and the Chickasaw Nation.
It has been suggested, but not argued at the trial, that the report of the conference committee upon the bill which in part became the act of March 3, 1887, ch. 359 (24 Stat. L., 505), indicates their opinion, if not their purpose, to exclude treaty cases from the jurisdiction of this court under the Bowman Act.
But the twelfth section, which the committee struck out because “ the conferees thought best not to allow an alien to sue on the basis of treaty or intentional (sic) [international ?] obligations at the will of the Secretary of State, and thought that the political power of the Government should be consulted,” contained a provision that the Secretary of State might refer a claim in behalf of an alien against the United States growing out of any treaty power or international'obligation, with the consent of the representatives of the Government of such alien, “ to hear and determine the same upon the principles of justice and international law, and to render judgment as those principles require,” with right of appeal to the Supreme Court. This was an extension of the jurisdiction of the court to enter judgment, or a modification of section 1066, excluding treaty cases from such jurisdiction.
*248 The committee was not willing to go thus far; but, while striking out that section, they re-enacted, in the very next section — now section 12 of said act of 1887 — the second section of the Bowman Act, authorizing the head of a Department to transmit any claim or matter to the court with two changes only: one that the reference should be with the consent of the claimant, and the other omitting the words “ for its guidance and action ” in reference to the effect of .the report of the facts and the law to the Department.
The jurisdiction of the Bowman Act is much like that of the organic act of February 24,1855, whereby the court was to report the facts and the law to Congress, without entering judgment, and under that act the court always took cognizance of treaty cases and reported the facts and law thereon. This construction was affirmed by Congress by the act of 1863, extending jurisdiction to the entry of judgment, from which section 9 of that act — now Bevised Statutes, section 1066 — excepted treaty cases other than those then pending in the court.
The only claim or matter excepted from our jurisdiction under the Bowman Act are specifically named in sections 3 and 4, and treaty claims are not among them.
The courts in all controversies between the Government and the Indian tribes have adopted a theory of interpretation favorable to the tribes •, and while the rules of law applicable to such controversies are not so strict as those governing differences between guardian and ward, they go to this extent, as has been held, that doubts are to be resolved in favor of the Indians, that they are not to be prejudiced by mere technical construction, and that words of doubtful import are to be taken most strongly against the United States.
By the two treaties of 1832 and 1834 the United States undertook a general supervision and care of the Ohickasaws ; a supervision and care more detailed in definition, more important in essence, than that of trustee to cestui qui trust, or even than that of guardian to ward, in effect much resembling the relation of parent to child. The Indian lands were to be surveyed and sold by the United States ; the proceeds were to be invested and held for the Indians by the United States. The agent, the land surveyor, register, and clerks, paid for by the Indians, were to be named by the United States; the Indians were not to go to war without the consent of the United *249 States, except in self-defense, and then were to be protected by the United States — in fact, without proceding further with an analysis of the two treaties, it may be assumed that any one who examines them will find the Government accepting most exceptional and almost parental relations towards the Indians.
The nation was oppressed (Art. I, Treaty 1832) by being made subject to State jurisdiction. Ignorant of the language and the laws of the white man, they could not understand or obey them. Eather than submit to such an evil they preferred to seek a new home, where they might live and be governed by their own laws. Sympathizing with them and agreeing with them, the President entered into the treaties — treaties manifestly intended to protect the Indians, to guard them so far as possible from the hardships and evils of enforced emigration. The United States assumed therefore a peculiar trust, a trust of guardianship and control j a trust not only financial but largely personal in its nature.
One branch of this trust, the financial one only, is now before us; and on one side it is contended that objection being made by the Indians to the accounts furnished by the United States it is essential for the latter to prove the honest and economical disbursement of the disputed items, while on the other hand it is urged that the presumption is in favor of the honesty of the account.
Fifty years have passed since the first of these expenditures was made, and the last was made some years before the treaty of 1852. Many important events have occurred since then; the country has been convulsed by civil war; the officers having charge of the emigration are dead, or at least are not obtainable j no fraud is alleged or shown on their part; the Indians were to some extent cognizant at the time of what took place; the evidence on either side is necessarily scanty in substance, however full in volume; there is a strong probability of honesty in every such transaction, and there is also an inevitable waste. These considerations, with others which will occur to any one who scans this voluminous record, induce us to eliminate any prima facie presumption, and forbid us from throwing upon either side the onus of meeting such a presumption. In fact, at this late day to allow the claimants to rest on their exceptions and to require of the Government proof that *250 each of the hundreds of small items in the accounts represents an honest, economical, and legal disbursement would produce an immediate final decision adverse to the defendants, while a demand upon the claimant for proof of a dishonest, extravagant, or illegal disbursement in each instance would throw them out of court at the outset, without substantial investigation into their rights.
Bo arbitrary rule of presumption can be introduced into a case of this nature. On the contrary, a middle course, aiming at substantial justice, must bo pursued; and while each side has formally and properly reserved all its rights, the case has been in effect presented substantially upon this theory.
We now proceed to the consideration of the several specific objections made by the claimants to the account made and presented to them by the United States in fulfillment of the provision contained in the treaty of 1852.
William M. Gwin was an agent of the Chickasaws, deputed to attend generally to their business with the United States, and among other duties he was to secure the payment of interest upon State stocks in which the Chickasaw funds had been invested, and wherein default had been made. The compensation provided for him in his power of attorney was enormous, and he surrendered it, together with all claims under it, for another instrument, authorizing him, for a contingent fee of 50 per cent., to recover the value of certain damaged provisions furnished the Indians by the United States. He had discovered the charge made against the Chickasaw account for these provisions, and he was successful in securing a credit for the Indians of the provisions’ value, less the 50 per cent, fee, which was paid him by the United States and charged against the Chickasaws.
We eliminate from the controversy questions as to the validity, between the Indians and Gwin, of the power of attorney, and as to the right of Gwin to assign any emolument coming to him under it, for Gwin did perform service; the result desired was attained; his assignees were in fact paid; and the Chickasaws’ fund is diminished by the amount so paid.
The question presented, then, is that of a trustee bound to feed his cestui que trust out of the trust fund, who furnishes the latter spoiled food, and thus forces the cestui to pay a large sum of money to obtain from the trustee the return of funds *251 thus improvidently disbursed. Such a charge, it seems to us, should in all equity and justice be borne by the trustee. That the fee was too large, under the circumstances set forth in the findings of fact, if that be true, is not a defense, for the trustee paid it with open eye and full knowledge of the circumstances. The matter was fully discussed, and in two opinions did the Attorney-General approve the disbursement. If fair in amount as against the injured Chickasaws it was fair in amount as against the United States, through whose fault, error, or laches the injury occurred which caused the agent’s employment and his compensation. The provisions furnished were damaged; the Chickasaws were charged with the cost; the United States did not voluntarily make good the loss; and the Indians were put to expense in enforcing their claim to reimbursement. On the record as it stands, the trustee seems to have been negligent, for nothing is shown to excuse the bad quality of the food furnished, and being so negligent, and not having voluntarily repaired the fault, he should be held to account for the damage suffered by his innocent eestui que trust. We think courts of chancery in a controversy between individuals would reach a similar determination; but whether that be so or not, we, in the advisory capacity in which we act in this case, a case between a strong nation and a weak tribe, its wards are of opinion that equity and justice require the United States to credit the Indians with this disbursement to Gwin of $56,021.99.
Strict provisions were made to protect the Chickasaws from extravagance in the management of the sales of their lands; the officers to be employed were carefully designated; their salaries were fixed ; even the number of clerks and their rate of pay was specified, while the Land Office was to have temporary use of a section of Chickasaw territory. No complaint is presented of- this class of expenditures made in Mississippi ,* but during some years clerks were employed in Washington attending here to the business of the nation in the Treasury and Interior Departments, and their pay, together with some minor and incidental expenses incurred in the usual course of their duty, are objected to by the claimants.
At the outset it may be admitted that nothing in the treaties in terms authorizes such expenditures. The only specific provisions in any way similar in nature to those thus incurred are for the salaries of officers to be stationed in Mississippi and em *252 ployed in the survey and sale of lands; most careful limitation is put upon the number of such officers, and upon their pay. There was to be a surveyor-general, with deputy surveyors, a clerk and a draughtsman, a land register and a receiver of mon eys, with a clerk each, the salary for each being limited and fixed (Art. Yin, Treaty 1832). The United States, however, had assumed other duties than those directly pertaining to the survey and sale of lands; those duties were many and varied; for example, after survey, allotments of land were to be made to each family not-immediately removing West until a determination to remove should be indicated to the President, when the allotments should be sold by him and the net proceeds paid over to the nation, as were the net proceeds of other lands (Art. IY, id.). Improvements were to be-valued by a discreet person appointed by the President, and the amount of this valuation was to be paid to the owner out of the proceeds of land sales (Art. Y, ,id); the President, when notified, was to advance funds for the Chickasaw emigration, and for the nation’s support during a certain period, the amount thereof to be afterwards refunded from the proceeds of laud sales (Art. X, id.); the United States were to invest Chickasaw funds in proper stocks for the benefit of the nation, to be drawn upon and disposed of in a? manner described in the treaty upon certain contingencies (Art. XI, id.).
It seems unnecessary to cite further from the treaties to show that the United States assumed very important and onerous duties, entirely apart from and different from those to be performed by the surveyors, register, and receiver in Mississippi; the handling of the trust funds, the advance and refunding of money, the decisions as to the payment of incompetents’ and orphans’ moneys, and the n umerous other burdens imposed could not be performed by the officers provided for in terms, but must be performed in Washington by the Government acting by the President and his subordinates; nor were these expenses those attending the “ surveying and selling ” of lands. For the proper performance of this duty clerks are necessary, stationery and other similar expenses are necessary, and as it is elementary law that a trustee is entitled to be reimbursed from the trust fund the reasonable expenses necessarily incurred by him in the performance of the trust, we need now only inquire whether this sum of money includes *253 only expenses necessary in their nature and reasonable in amount.
That they are necessary in nature is apparent, but it is objected that they are unreasonable in amount, and were incurred because of the uselessly cumbersome system of administration in force in Wasüington, which, however valuable in the general affairs of a great Government, is too intricate and expensive when applied to the care of trust funds.
When the Indians turned over the care of their finances to the United States they, it must be assumed, knew what they were doing, with whom they were dealing. A great governmental machine, with its lack of individual responsibility corrected by a system of checks and counter-checks, cannot be. conducted as cheaply as the office of a private merchant or banker. But in return for the greater expense the Indians received two very substantial benefits: first, absolute responsibility, which they never could have got from an individual trustee; second, freedom from any charge by way of compensation to the trustee, which it is unlikely that they would have received from any individual, if it were possible for any individual to assume the multiform cares of this trust.
Nor can they complain of surprise, for the system of Hamilton is to-day in force in the Treasury, the theories of executive administration have been wonderfully conservative in all the Departments, and disbursements of this nature have been uniformly charged against the various Indian funds. Something less than $5,000 a year we do not consider extravagant under all the circumstances for the care and administration of Chickasaw interests, and we therefore are of opinion that this charge of $79,969.40 for clerk hire in Washington is proper in its nature and not unreasonable in its amount.
In assisting the emigration various individuals were employed by the Government styled conductors, assistant agents, or having some other similar title; their pay and expenses were charged against the nation’s fund, and these charges are objected to not as unnecessary or extravagant, but because, as is alleged, they should under the treaties be borne by the United States and not by the Indians. Article X of the treaty of 1832 provides that when the President shall receive notice from the Indians of their intention to remove he shall furnish them “the necessary funds and means for their transportation *254 and .journey, and for one year’s provisions after they reach their new homes in such quantity as the nation may require, and the full amount of such funds, transportation, and provisions [was] to be paid for out of the proceeds of the sales of the ceded lands”; further, should the Ohickasaws remove before that money was available, then the United States should furnish them u any reasonable sum of money for national purposes which may be deemed proper by the President,” to be afterwards refunded by the Indians.
The payments complained of were actually made; they were necessary; they are not shown to be extravagant; whether they were authorized by treaty is the real question in issue. The treaty of 1832 is rather ambiguous on this point, and it is contended that the means for the Indians’ “ transportation and journey,” which the President was authorized to furnish, naturally and properly included charges of this nature, as without such assistance the Indians could not emigrate with safety and comfort. On the other hand it is urged that the phraseology of the treaty of 1832 allowed the Government to charge against the Indians only the cost of transportation and supplies, and these being expressly mentioned other charges are -excluded on the doctrine of expressio unius exclusio alterius. The Indians are entitled to have all doubts settled in their favor and words of doubtful import are to be taken most strongly against the United States. An application of this doctrine to the case at bar might support the claimants’ position. The treaty of 1834, however, gives a clear statement of the intention of the parties when it provides in its thirteenth article that the United States shall furnish competent persons to conduct the Indians to their destination, and also supplies for a certain period, “ the supplies so afforded to be chargeable to the general Chickasaw account.” Here is a distinct provision for conductors, a distinct provision for supplies, and a distinct provision that the cost of supplies only shall be charged against the Indians. It is evident that the conductors were to be furnished by the United States and paid by the United States.
The letter of the chiefs, dated in October, 1837, is without effect upon this branch of the case, first, because the treaties standing together are clear in intent and the chiefs could not vary them, and, second, because the letter manifests no such *255 purpose or desire. The letter suggests the appointment of superintendents, not conductors, and suggests the appointment of only u one or more” such officers, manifesting an intention to confine the number within very narrow limits, an intention further shown by the fact that the chiefs give the names of two, and only two, individuals, the appointment of either or both of whom would be satisfactory to them and their people. The duties of these officers were different in nature from those of conductors; they were to superintend the removal, to take a census, to provide means for transportation and subsistence $ in short, the superintendent (for in fact one only was appointed) was a superior and supervising officer, while the conductors were merely subordinate employés acting under his direction in carrying out the duties imposed upon him. The facts that the chiefs desired all 11 other necessary expenses ” attending the emigration to be paid out of the nation’s fund does not extend the scope of the treaties and must be read and understood in the light of their provisions, which, as we have seen, are on this point sufficiently clear. In our opinion, the thirteenth article of the treaty of1834 is decisive of the question, and the Chickasaw fund should be credited with the sum of $26,563.68.
The United States officers having charge of the emigration entered into a contract with one Simeon Buckner to transport the Ohickasaws and their baggage on steamboats, at an agreed rate, to the Indian Territory. The nation authorized an arrangement for water transportation, and pursuant to this authority the contract was made, and the necessary boats were provided. When the time came to start many of the Indians refused to take the boats, and large bodies of them went overland, either all the way or in some instances as far as Little Bock, where they were taken up by the boats and carried onto their destination. The contract with Buckner provides a rate of compensation, but it does not designate the number of passengers for whom he was' expected to provide transportation, nor does it limit the time within which the service was to be performed. On these points we are left in the, dark; but we find that Buckner was ready on time to perform the duty imposed upon him; that he was much delayed by the Ohicka-saws, who were irregular and dilatory in reporting on board; that the amount of baggage was far in excess of what had *256 been expected, while a large number of Indians declined to accept the transportation provided for them by their own request. After careful consideration of all the facts developed in this branch of the case and set forth in the findings, we are of opinion that the Government agents were fully authorized to contract with Buckner as they did, and that he had a right to expect and was bound to provide for the transportation of some four thousand Indians. If this were all we should find B uckner entitled only to $61,000, the contractprice for the transportation of this number of Indians, with the prescribed amount of baggage. But it is by no means all; the Indians delayed the boats; they carried baggage far in excess of the allowed amount; they carried a great deal of stock; some were picked up on the way, failing to get through by land, and Buckner was much impeded and delayed in the performance of his contract, and undoubtedly put to increased expense. He received under this contract $148,393.50, a gross sum made up as follows :
Transportation of Indians...................................$39,652 00
Transportation of baggage............................,..... 54,520 00
Demurrage.................................. — ............. 14,872 50
Damages.....................-.............................. 37,749 00
Com freight................................................. 1,600 00
Total................................................ 14S, 393 50-
Objection is made to $5,877.50 of the charge for transportation, to $14,672.50 of the charge for demurrage, and to the charge of $37,749 for damages.
This latter sum was paid in July, 1840; long prior to this the Government officers in charge of the removal had paid Buckner $39,650 on account of his contract, but, apparently dissatisfied with this, Buckner had claimed additional compensation, on the ground that he had been ready for all the Indians, and through no failure of his they had not been transported as. agreed; therefore he asked that his compensation be increased to the amount he would have received had all reported on his boats. The sum was allowed as “ the balance of his account, for the transportation of 5,338 Ohickasaw Indians from Memphis, Tenn., to Fort Coffee, Arkansas, per contract, October 1, 1837.” The contract price for transporting these Indians would be $77,401; adding to this the cost of the regulation amount of baggage per head, 30 pounds at the full contract rate,. *257 $2.50 per cwt., amounting to $4,000, and Buckner would be entitled to receive only $81,401. There is nothing to show that Buckner had a right to anticipate the removal of more than 4,000 Indians; a careful study of the evidence leads us to the conclusion stated in the findings, that about that number he had a right to expect and was bound to provide for. Then at the full contract price he would have received the sum of $61,000, made up as follows: 4,000 Indians, at $14.50 per head, $58,000; 120 cwt. baggage, at $2.50 per cwt,, $3,000.
He also should have received the amount allowed for transportation of corn, $1,600, swelling the total to .$62,600, leaving an excess paid him of $85,793.50.
The testimony is too unsatisfactory and incomplete for us to go into the detail of each item paid Buckner, and we are forced to treat the payments together and to endeavor to discover, taking all tbe circumstances together, what would have been a reasonable and fair allowance under the circumstances. As he did not carry 4,000 Indians, as he had a right to provide for that number, as he provided for them, and through no fault of his they did not report on board, we think a fair measure of damage for the breach of contract is what he would have received had he been allowed to carry it out as stipulated and understood. This allowance, however, would include demur-rage and other damage caused by the non-arrival of the Indians.
The objections made by the claimants, however, cover a sum much less in amount than would beallowed them on this theory of the case, and while the evidence is not sufficient to allow us to examine into the details of the various allowances to Buckner, and the facts peculiar to each of them, still, considering the case as a whole, we are of opinion that he was overpaid, certainly not less than the sum total of the various amounts objected to, and that sum ($58,299) should be credited to the nation.
On the question of rations there is little to add to what appears in the findings of fact. Under all the circumstances therein detailed we think the charge a proper one against the tribe.
The treaty of 1834 (Articles IY and YIII) divided the Chickasaws holding reservations into three classes, adults competent to manage their own affairs, adults not competent to manage *258 their own affairs, called colloquially the “incompetents,” and minor orphans. Adults were permitted to dispose of their reservations upon compliance with certain requirements, while the incompetents were not allowed to sell, lease, or otherwise dispose of their reservations, and as to them the treaty provided (Article IV) that no transfer should take place unless certain well-defined conditions were fulfilled.
The Ohickasaws do not complain that the “incompetents’” lands were improperly sold, but they claim that in many instances the money coming from the sales was paid out of the Treasury in violation of that part of the treaty which required that the consideration of the sales “ shall remain as part of the general Chickasaw fund in the hands of the Government until such time as the chiefs in council shall think it advisable to pay it to the claimant or to those who may rightfully claim under said claimant, and shall so recommend it.” (Article IV.)
They farther complain that the Government’s action enabled Indian traders to defraud the “incompetents” of the greater part of the proceeds of the sales of their lands.
These complaints are founded substantially upon the following grounds:
First, the Government never had proof tending to show that the chiefs in council, advised payment to a single incompetent of the money coming from the sale of his lands; second, the chiefs in council in fact never did give such advice.
To this the Government sets up in answer the treaty of 1852, which provides that the United States shall “ not be liable to repay moneys held in trust for the benefit of the ” orphans and incompetents when the payments have been made “ upon the recommendation or certificate of the persons appointed for that purpose in the fourth article of the treaty of 1834, or of their successors, and in other respects in conformity with the provisions of that article; ” and the defendants contend that the persons “appointed” were the persons named in the article, that is those persons commonly called commissioners, upon whose certificate only land could be sold, and therefore any certificate bearing their signatures is valid and binding upon the Ohickasaws.
Denying this position and still contending that the approval of the commissioners is important only as to the sale of the reservations, and that the after-payment of money from the fund *259 depends for its validity upon the judgment of the chiefs in council, the Indians urge other matter in rebuttal, which we shall consider later.
The claimants’ position then is, first, under the treaty of 1834, that all money paid out of the fund on the recommendation of the commissioners, without the recommendation of the chiefs in council, was wrongfully paid ; and second, having proved the fact that the chiefs in council did not recommend the payment of any of the money, a prima facie case is presented of wrongful payment to persons having no right to.receive; and thus is established the condition of relief required by the treaty of 1852. Should these points not be conceded, the claimants then proceed a step farther and endeavor to show that the recommendations upon which the money was paid were fraudulent in character, that the facts certified were not true, that some of the commissioners’ signatures were forgeries, that the alleged assignments by the individual Indians to the traders were not valid, and tb at through a conspiracy, to which some of the commissioners, the Indian agent, and the traders were parties, the individual incompetents were grossly imposed upon. It is particularly urged that the king’s cross, or mark, was not affixed by him but by Albertson, one of the commissioners.
This we have found to be true in fact, but we do not find that the king did, or that he did not, authorize Albertson so to affix his cross, for the evidence on this point does not seem to us sufficient to rebut the presumption that officers acting in performance of a duty imposed by law act honestly; and if the commissioners had any power at a,ll in the matter they acted as the agents, not of the United States, but as the agents of the Ohickasaws in carrying out a duty imposed upon them by the treaties for the protection of members of their own tribe. There is nothing in the record bringing home to the United States knowledge of the fact, if it be a fact, that Albertson defrauded his own people, or knowledge of the fact, if it be a fact, that the king, Ish-to-ho-to-pa, either wittingly or unwittingly, through his neglect or otherwise, was actively or through negligence a party to the fraud, if one was committed.
Be it conceded that Ish-to-ho-to-pa never did affix his cross mark, nevertheless others of the commissioners did sign the certificates and signed them knowingly, and in doing this they acted for the Indians and did not act for the United States. *260 If there were fraud in this transaction, if there were mistake, if there were negligence, the fraud, mistake, or negligence was that of the commissioners, or some of them. It was the fraud, mistake, or negligence of the Indians themselves, of the persons deputed by the Chickasaw Nation to protect the interests of individuals in the tribe, and any loss which has occurred to the individuals should be made good by the tribe. A ward cannot impose upon his guardian, dissipate and waste the funds acquired through the imposition, and then secure a second recovery upon substantially the ground of his own wrong or negligence. Individual incompetents and orphans were undoubtedly imposed upon, and received in calicoes and ponies much less than the values of their claims, but such a result could not have been attained unless Ish-to-ho-to-pa, or Albertson, or their colleagues had been negligent or dishonest. It has not seemed to us necessary to go into the morals of the transaction, for whatever immorality existed was shared by the commissioners, to whatever wrong was committed they were parties, in whatever conspiracy was formed they were absolutely necessary and principal elements.
The United States paid over the moneys upon what appeared upon their face to be properly signed certificates, certificates undoubtedly signed by some of the commissioners, cer-. tificates as to which at the time no complaint was made. The individual Indians accepted the insufficient consideration given them by the traders, and their authorities and agents presented no complaint, put the Government upon no inquiry. Under all these circumstances we do not think the United States under obligations to pay again the moneys already once paid over by them on this account, provided the certificate of the so-called commissioners was in law sufficient authority for the payment. Here a distinction is to be noted between the position of the “incompetents” and that of the “ orphans.”
The treaty of 1834 required that the incompetent trust fund should remain in the hands of the Government “ until such time as the chiefs in council shall think it advisable to pay it to the claimants, or to those who may rightfully claim under said claimants, and shall so recommend it.” (Art. IY.) The recommendation of the chiefs in council was therefore necessary as authority for a disbursement by the .United States from this fund. Nevertheless, between the years 1840 and 1843 pay- *261 merits were actually made upon the certificates hereinbefore recited and without, so far as is shown to us, any recommendation by the chiefs in council. Then followed the Treaty of 1852 (10 Stat. L., p. 974), which was evidently intended to satisfy existing grievances of the Chickasaws, and which contained this provision:
“ It is also alleged by the Chickasaws that there are numerous cases in which moneys held in trust by the United States for the benefit of orphan and incompetent Chickasaws have been wrongfully paid out to persons having no right to receive the same. It is therefore further agreed, that all such cases shall be investigated by the agent of the United States under the direction of the Secretary of the Interior. And if it shall appear to the satisfaction of said Secretary that any of the orphans and incompetents have been defrauded by such wrongful payment, the amount thus misapplied shall be accounted for by the United States, as if no such payment had been made.” (Art. IY.)
That is, if it appear that incompetents’ money has been paid out wrongfully, and paid out to persons not entitled to receive the same, then, if it also appear that any of the incompetents have been defrauded by the wrongful payment, the amount thereof shall be accounted for. There must have been, to justify recovery under this article, a wrongful payment; this payment must have been made to an unauthorized person, and the incompetent must have been defrauded. The Senate, however; when the treaty was before them, added several provisos, among them this, at the end of the article just cited:
“ And provided further, That the United States shall not be liable to repay moneys held in trust for the benefit of orphan and incompetent Chickasaws, in any case in which payment of such moneys has been made upon the recommendation or certificate of the persons appointed for that purpose in the fourth article of the treaty of 1834, or of their successors, and in other respects in conformity with the provisions of that article.” (10 Stat. L., p. 976.)
It now becomes important to determine who were the persons appointed in the fourth article of the treaty of 1834 for the purpose of making a recommendation or certificate. That article names by their proper names seven individuals, the certificate of two of whom was necessary for the sale of a reservation, and this certificate was to show that the Indian owning or claiming the land was capable to manage his affairs. These seven are *262 the only persons named by name in the article. Their certificate was to be indorsed by the agent, and th e action was to be approved by the President or such person as he might designate. Then follows the provision we have already discussed as to the recommendation of the chiefs in council, and after further details, not now important, as to the sale of lands, comes a provision that as the king and the delegation who signed the treaty might die, resign, or remove, any vacancy should be filled by the Secretary of War, after selections made by the chief, and after certificate by the Indian agent as to the qualifications, discretion, and ability of the person so se lected. Therefore, in this article are mentioned by name seven persons, of whom five were the five who signed the treaty on behalf of the Indians; also the President of the United States, the Secretary of War, the Indian agent, and the chiefs in council. When the treaty of 1852 was approved by the Senate and ratified by the President, all the facts were before them. This is a presumption of law, which, in this case, is also established as a fact by the form and phraseology of the treaty and its amendments. The President and the Senate knew that someten years before money had been paid from the orphans’ and incompetents’ accounts upon commissioners’ certificates; they knew of charges that this money had been improperly paid; and yet how carefully they protected this particular class of of payments. The President required proof not only that the money had been wrongfully paid, but that it had be en paid to persons having no right to receive it, and also that the orphan or incompetent had been defrauded. The Senate went a step further and said, in effect, let all of these three points be established, and still we do not agree to account for the moneys, provided the payment was made either upon the recommendation or upon the certificate of the persons “ appointed for that purpose” in the fourth article of the treaty of 1834.
The money of the incompetents, says the treaty of 1834, shall be paid over when the chiefs in council think it advisable and recommend it.
It has been in effect contended that the use of the words “ persons appointed for that purpose ” indicates an intention to make valid the acts, illegal in their inception, of the commis-. sioners in recommending the payment of incompetents’ money, by which they usurped a power vested in the chiefs in council- *263 The use of the word u successors” iu the same clause is supposed to be an additional indication of the parties’ intent, as the word would not naturally be applied to a permanent body like the chiefs in council, but would naturally be applied to a temporary collection of named individuals as to whom succession was specifically provided. To these and similar arguments it may be answered that the Senate in one article was dealing in concise language with two subject-matters, first, the incompetents who by Article IV of the treaty of 1834 were to be paid only when the chiefs in council should so recommend; second, the orphans who by Article VIII of the same treaty were to be paid only when a majority of the seven persons named in Article IV should so recommend. The treaty-making power knew that payments had been made to incompetents without a sign indicating even acquiescence on the par t of the chiefs in council, and they knew of the payments to the orphans upon certificates correct upon their face, but alleged to be in fact fraudulent through the acts of some at least of the commissioners, the representatives of the Indian tribe. In the one case the United States had paid upon vouchers illegal on their face, in the other they had paid upon vouchers valid upon their face but in fact fraudulent through the fault of the tribe. Thus was presented a clear reason for the distinction intended to be made between the claims of the incompetents and those of the orphans. Not one of the recommendations for payment to incompetents was made by the chiefs in council, the only body or the only persons appointed or authorized for the purpose in the treaty of 1834; but the “ persons appointed ” to make recommendations as to the orphans or “ their successors ” had, or at lea st some of them had, recommended the payments made to the orphans. In the case of the incompetents the vouchers were on their face worthless ; in the case of the orphans the vouchers were on their face valid and could only be invalidated by proof of some wrong, neglect, or error, to which the Indians’ representatives were necessary parties.
Where, then, there has been a wrongful payment to an incompetent, and where the payment had been made to a person having no right to receive it, and no person is entitled to receive money by virtue of assignment from an individual confessedly incompetent to manage his own affairs, then if the incompetent has in fact been defrauded, as he evidently was to *264 some extent in the case before ns, then and to that extent the United States should account to the Chickasaw Nation.
The eighth article of the treaty of 1834 made provision for protecting what are called in this case “orphan” Chickasaws, that is, males and females under full age “ whose father being dead, the mother again has married, or who have neither father nor mother.” Their reservations might be sold upon the recommendation of a majority of the seven persons Darned in the fourth article that the sale would prove advantageous to the parties interested; this recommendation was to receive the approval of the President or his agent, after which the. proceeds of the sale were to be retained by the Government or, if practicable, invested until the orphans came of age or married, when payment was to be made to those entitled to receive it, provided a majority of the commissioners with the Indian agent should certify that such a course would be to the advantage of those parties. It is now contended by the claimants that payment from the “ orphans’ ” fund was made upon certificates not signed by a majority of the seven commissioners, and that but a small portion of the money ever in fact reached the orphans, the facts being substantially the same as in the case of the “incompetents.” We have no doubt that the orphans were imposed upon and parted with their rights improvidently, but following the line of argument already marked out, we cannot hold the United States liable for their sufferings or hardships. The wards of the nation were not the individuals, Im-mi-ah-ho-ka, Yiney, or Puck-sha-nubby, but the Chickasaw Nation. That nation set up in protection of its rights and in protection of the rights of its individual members, a set of men, Chickasaws, members of their own tribe, one their king, others headmen and members of their council, and to these the Government of the United States had a right to look with confidence for an honest and faithful performance of the duties imposed upon them in the treaty by their own nation’s election. Their fraud, mistake, or laches cannot raise any obligation in the United States, the party deceived or misled by them, for they acted as the agents of the Indians, not as the' agents of the Government.
We are of opinion that the treaty of 1852 applies to this claim, and while we have no doubt that individual orphans were badly treated we cannot find that the Government is responsi *265 ble tberefor to tbe tribe whose members and selected officials and responsible representatives were parties to whatever wrong was done, to whatever injustice was committed.
We conclude from our examination of the case that the fund of the Chickasaw Nation should be credited with the sum of $240,164.58. In an action between individuals interest also would be allowed, for the issue presented is one of unauthorized disbursement by a trustee of trust funds expressly stipulated to be held invested in interest-bearing securities. We refrain, however, from expressing any opinion on this subject, as the question must necessarily be taken to the legislative department of the Government, which alone has power to grant relief, which will consider the equities of the case, and which will decide whether it is one wherein the doctrine should be waived that, as the sovereign does no wrong, and is ever ready and willing to pay just debts, the Government pays no interest.
A certified copy of the findings of fact herein and of this opinion will be sent by the clerk to the Secretary of the Interior.